## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

ENIT D. SANTANA,

      Plaintiff,

      v.

MICHAEL J. ASTRUE, Commissioner of
the Social Security Administration,

      Defendant.

Civil No. 10-1714 (DRD/BJM)

## REPORT AND RECOMMENDATION

      Plaintiff Enit D. Santana ("plaintiff" or "claimant") filed a complaint seeking judicial review of the decision of the defendant, Commissioner of Social Security ("Commissioner"), that she was not disabled prior to December 31, 2005, under sections 216(i) and 223(d) of the Social Security Act ("Act"), 42 U.S.C. §§ 416(i), 423.  Santana asks that the judgment be reversed and disability benefits granted, or, in the alternative, that the case be remanded for a rehearing.  (Docket No. 1).  The Commissioner answered the complaint and filed a supporting  memorandum of law.  (Docket Nos. 5, 11).  Santana also filed a memorandum of law in support of her position.  (Docket No. 9).  The matter was referred to me for a report and recommendation.  (Docket No. 12).  After careful review of the record and the briefs on file, I recommend that the Commissioner's decision be **affirmed**.

## LEGAL STANDARD

      The court's review is limited to determining whether the Administrative Law Judge ("ALJ") employed the proper legal standards and found facts upon the proper quantum of evidence. Manso-Pizarro v. Sec'y of Health & Human Servs., 76 F.3d 15, 16 (1st Cir. 1996).  The ALJ's findings of fact are conclusive when supported by substantial evidence, 42 U.S.C. § 405(g), but are not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts.  Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999); Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991); Da Rosa v. Sec'y of Health & Human Servs., 803 F.2d

24, 26 (1st Cir. 1986).  The court "must affirm the [Commissioner's] resolution, even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence." Rodríguez Pagán v. Sec'y of Health & Human Servs., 819 F.2d 1, 3 (1st Cir. 1987).

The burden is on the claimant to prove that he is disabled within the meaning of the Act. See Bowen v. Yuckert, 482 U.S. 137, 146-47, n.5 (1987).  A claimant is disabled under the Act if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Under the statute, a claimant is unable to engage in any substantial gainful activity when he "is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."[1]  42 U.S.C. § 423(d)(2)(A).  In determining whether a plaintiff is disabled, the ALJ must consider all of the evidence on the record. 20 C.F.R. § 404.1520(a)(3).

A five-step sequential evaluation process must be applied to every case in making a final determination as to whether a plaintiff is disabled.  20 C.F.R. §404.1520; see also Bowen, 482 U.S. at 140-42; Goodermote v. Sec'y of Health & Human Servs., 690 F.2d 5, 6-7 (1st Cir. 1982).  In step one, the ALJ determines whether the plaintiff is engaged in "substantial gainful activity."  If she is, disability benefits are denied.  20 C.F.R. § 404.1520(b).  If she is not, the ALJ proceeds to step two, through which it is determined whether the claimant has a medically severe impairment or combination of impairments.  20 C.F.R. § 404.1520(c).  If the plaintiff does not have a severe impairment or combination of impairments, the disability claim is denied.  However, if the impairment or combination of impairments is severe, the evaluation proceeds to the third step, in which it is determined whether the plaintiff has an impairment equivalent to a specific list of

---

[1]The phrase "work which exists in the national economy" means "work which exists in significant numbers either in the region where such individual lives or in several regions of the country."  42 U.S.C. §423(d)(2)(A).

impairments contained in the regulations' Appendix 1, which the Commissioner acknowledges are so severe as to preclude substantial gainful activity.  20 C.F.R. § 404.1520(d); 20 C.F.R. pt. 404, subpt. P, App. 1.  If the impairment meets or equals one of the listed impairments, the plaintiff is conclusively presumed to be disabled.  If the impairment is not one that is conclusively presumed to be disabling, the evaluation proceeds to the fourth step, through which the ALJ determines whether the impairment prevents the plaintiff from performing the work she has performed in the past.  If the plaintiff is able to perform her previous work, she is not disabled.  20 C.F.R. § 404.1520(e).  If it is determined that the plaintiff cannot perform this work, then the fifth and final step of the process calls for a determination of whether the plaintiff is able to perform other work in the national economy in view of her residual functional capacity, as well as age, education, and work experience.  If the plaintiff cannot, then she is entitled to disability benefits.  20 C.F.R. § 404.1520(f).

The plaintiff has the burden, under steps one through four, of proving that she cannot return to her former employment because of the alleged disability.  Santiago v. Sec'y of Health & Human Servs., 944 F.2d 1, 5 (1st Cir. 1991) (per curiam).  Once a claimant has demonstrated a severe impairment that prohibits return to her previous employment, the Commissioner has the burden, under step five, to prove the existence of other jobs in the national economy that the claimant can perform.  Ortiz v. Sec'y of Health & Human Servs., 890 F.2d 520, 524 (1st Cir. 1989).

## FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff Santana was born on August 4, 1971, has a high school education, and previously worked as a packer and a quality inspector at a factory.  (Transcript ["Tr."] 60, 337, 346).  Claimant alleges a disability onset date of October 4, 2000 at age 29 due to a back disorder, depression, migraine, and pain.  She was last insured for Social Security disability benefits on December 31, 2005.  (Tr. 17, 19, 20, 22).

## I.      Physical Condition

Claimant was treated at the Physical Therapy Center Las Piedras between June 17 and 30,

1997. (Tr. 130-47). At her initial medical evaluation on June 17, she complained of neck and right shoulder pain for the past week, with hand numbness and cramps; she had muscle spasms in the right upper trapezius and dorsal paravertebral area. Her range of motion in the neck and shoulders was unlimited, and she had normal muscle strength in the upper and lower extremities. Claimant was diagnosed with paravertebral myositis and was prescribed a two-week course of six physical therapy appointments, starting that day. Treatment included hot compresses, ultrasound, electric stimulation, massage, and active exercises. Upon completing the six sessions on June 26, she had responded positively and reported improvement. When reevaluated on June 30, she reported feeling better. (Tr. 133, 314, 135, 138, 141, 143).

In June 2000, she received normal results from x-rays of her shoulders, right hand, and wrist, as well as from electrodiagnostic studies of her upper extremities; there was no evidence of radiculopathy, nerve entrapment, or neuropathy. (Tr. 176-82). Claimant was treated through the State Insurance Fund ("SIF") from June 28, 2000 through May 28, 2004. (Tr. 157-75). An x-ray taken on June 28, 2000 showed straightening of the cervical curvature secondary to muscle spasm, yielding a diagnostic impression of paravertebral muscular spasm. (Tr. 175). Santana was prescribed physical therapy on June 28 and July 20, 2000. (Tr. 171-74). Between September and December 2000 (a period covering the alleged disability onset date), Dr. Noel Arnau of the Advanced Musculoskeletal Medicine center in Humacao treated claimant with a physical therapy series and daily nonsteroidal anti-inflammatory medications and muscle relaxants for trapezius myositis and chronic cervical spine pain secondary to cumulative trauma. (Tr. 183-88).

In November 2003, an evaluation by a hand surgeon for mild tenderness on the radiocarpal joint of the right forearm yielded negative Tinel and Phalen's tests and no evidence of muscle atrophy or weakness, De Quervain syndrome, or carpal tunnel syndrome. She was injected with Kenalog at the point of tenderness in her wrist, and right wrist x-rays taken three days later yielded normal results. (Tr. 165-67). On February 2, 2004, claimant was treated for basal joint pain in the right thumb, most likely due to inflammatory capsulitis, and was prescribed a splint for daytime use.

(Tr. 161-64).  On May 28, 2004, after reporting that the pain persisted and the splint helped a little, claimant received a Kenalog injection at the basal joint.  (Tr. 159-60).

Santana was treated periodically by physician Dr. Luisa Rivera Chinchilla at the Polyclinic Las Piedras from February 20, 2001 through November 2007.  (Tr. 150-56, 294-317, 326-27).  On her initial visit, she reported feeling nauseated, dizzy, and feverish.  (Tr. 150-56).  She reported pain on June 28, 2004 (Tr. 316-17), and was seen again two weeks later for right shoulder and wrist pain. (Tr. 314-15).  X-rays of the right shoulder and wrist on June 29, 2004 were normal.  (Tr. 228).  A right shoulder MRI on November 23, 2004 showed mild supraspinatus tendinosis.  (Tr. 227, 313). She was treated three weeks later for right hand and wrist pain.  (Tr. 311-12).  X-rays taken January 12, 2005 showed straightening of the normal lordosis, yielding a diagnostic impression of paravertebral muscle spasm.  (Tr. 226, 308).  Claimant tested positive for antibodies to Epstein-Barr virus in March 2005 blood tests.  (Tr. 300).  On January 24, 2007, she reported pain in her neck and lower back and was prescribed  pain medications.  (Tr. 293-94).  On June 4, 2007, cervical spine x-rays yielded a diagnostic impression of cervical spasm and anterolisthesis in the C-3, C-4, and C-5 vertebrae; shoulder x-rays were normal.  (Tr. 293).

In a neurological evaluation conducted by Dr. Edgar Hernández Viera for the Social Security Administration's ("SSA") Disability Determination Program ("DDP") on September 28, 2004, claimant alleged depression, carpal tunnel syndrome, and constant, very intense pain in the back, hands, shoulders, and cervical spine, starting in 1995.  She reported that she was taking Skelaxin, Ambien, Risperdal, Ultram, Effexor, and Depakote.  Claimant complained of tenderness to palpation over the cervical and lumbosacral spine.  She had normal range of motion throughout her body, no limitations on hand function, bilateral negative Phalen's and Tinel tests, normal gait, and intact coordination.  She rated 4 out of 5 for strength and had decreased pinprick bilaterally at the L4 dermatomes.  X-rays of the lumbosacral spine showed narrowing of the L4-L5 intravertebral space with straightening of the spine due to muscle spasm, yielding a diagnostic impression of discogenic disease at L4-L5; the cervical spine x-ray showed straightening of the normal vertebral curvature

suggestive of paravertebral muscle spasm.  Claimant was diagnosed with chronic low back and neck pain, cervical strain, and a rule-out for lumbosacral radiculopathy.  (Tr. 189-96).

Non-examining physician Dr. Francisco Rodriguez de la Obra completed a physical residual functional capacity ("RFC") report on November 3, 2004, which was reaffirmed on April 22, 2005 by non-examining physician Dr. Osvaldo Rivera Marrero.  Dr. Rodriguez gave a primary diagnosis of cervical-lumbar pain, and reported that claimant could occasionally lift and/or carry 50 pounds, frequently lift and/or carry 25 pounds, had otherwise unlimited ability to push and/or pull, and could sit, stand and/or walk for a total of about 6 hours in an 8-hour workday.  The physical RFC assessment rated claimant occasionally able to climb but with no other postural limitations, and no manipulative, visual, communicative, or environmental limitations.  Dr. Rodriguez briefly noted supporting evidence including x-rays showing spasm and intravertebral narrowing as well as reports concerning back pain, shoulder and hand problems, and emotional condition.  (Tr. 250-59).

In an arthritis medical report for the DDP dated February 15, 2005, Dr. Nydia Brugueras-Colon, who first treated claimant on December 28, 2004, wrote that claimant's condition had caused limitations since August 2000 due to pain in the right shoulder and hand.  Dr. Brugueras reported that as of the last exam on February 15, 2005, claimant had a guarded prognosis, with spinal flexion limited to 30 degrees, multiple tender points in the back, severe pain in the neck, right arm and hand, and headaches and insomnia.  Her ability to sit, stand, and walk was impaired by pain and occasional locking in the back, but she did not require any assistive device to walk.  She did not tolerate sitting, standing, or walking for more than three hours.  Dr. Brugueras reported that claimant had bilateral joint pain, tenderness, and color and temperature changes in the hands, with sweaty, bluish-tinged palms.  Claimant had bilateral negative Tinel and Phalen's tests, and her hand abilities were unlimited except for reduced gripping ability (rated 3 out of 5) in the left hand.  (Tr. 212-219).

In a general medical report for the DDP dated February 25, 2005, Dr. Rivera of the Polyclinic Las Piedras reported that claimant's limitations began in 2000, when she could no longer do repetitive movements with her hands and arms.  Dr. Rivera reported that as of her last exam on

February 25, 2005, claimant had decreased hand strength, movement limitation in the arms and lower back, 45 degrees of trunk flexion, 30 degrees of cervical spine flexion, right wrist inflammation, and major depression, and was responding poorly to treatment for pain and spasm, with a poor prognosis.  Based on her medical findings, Dr. Rivera opined that claimant could not do repetitive physical exertion.  (Tr. 220-25).

In a "Medical Source Statement of Ability to Do Work-Related Activities (Physical)" for the SSA dated June 15, 2007, Dr. Rivera reported that claimant could occasionally lift less than 10 pounds, could not frequently lift any weight, could stand at least 2 hours in an 8-hour workday, could sit for less than about 6 hours in an 8-hour workday, and had limitations on pulling in the upper extremities due to severe muscle spasm.  Dr. Rivera reported that claimant could occasionally balance and never climb, kneel, crouch, crawl, or stoop due to a history of chronic low back pain secondary to muscle spasm.  Dr. Rivera wrote that claimant's manipulative functions were constantly limited in handling and reaching in all directions, but not fingering or feeling, and that she had no limitations on seeing, hearing, or speaking.  Dr. Rivera reported that claimant had environmental limitations for noise, dust, vibration, humidity/wetness, hazards, and fumes, odors, chemicals, and gases.  (Tr. 289-92).  In a letter dated November 9, 2007, Dr. Rivera wrote that Santana suffered from severe muscle spasms in the shoulders, with movement limitations in the arms and loss of strength in her hands, and that claimant's medical condition caused her limitations in her daily living activities at home and socially.  (Tr. 326-27).

**II.     Mental Condition**

Psychiatrist Dr. José López Márquez treated Santana on a monthly basis between March 2004 and November 2007.  (Tr. 229-49, 328).  In a psychiatric medical report for the DDP dated August 25, 2004, based on monthly appointments from March through August 2004, Dr. López reported that claimant complained of shoulder and neck pain, weakness, tiredness, lack of strength or energy, and sleep problems.  Dr. López reported that claimant stopped working due to her multiple physical conditions, low productivity, and absenteeism.  He opined that her conditions were "disabling" and

"are chronic, severe, permanent, and progressive; totally irreversible damage completely limit[s] her daily activities." She wore a splint but reported that medications and hot pads did not help at all. Claimant could not lift anything or do household chores; her husband and mother helped her with daily living activities. She had poor social functioning and relationships, did not like to go anywhere, and had poor tolerance for stress due to her severe physical conditions. She was irritable, angry, anxious, forgetful, impulsive, and aggressive, had hallucinations, and felt useless. Claimant had a restricted affect, sad, tearful mood, slow psychomotor activity, and logical, coherent, relevant thought. She was oriented in person, place, and time, but had a short attention span, poor recent memory, judgment, and insight, mild cognitive disorder, and impaired attention. She performed poorly on tests of immediate and short-term memory, concentration, and intellectual functioning. Claimant was taking Effexor, Ambien, Depakote, Risperdal, and Lorazepam. Dr. López diagnosed mixed-type bipolar disorder, gave claimant a Global Assessment of Functioning ("GAF") score of 40% with a poor prognosis, and stated she could not handle funds. (Tr. 236-49).

In a Psychiatric Review Technique Form ("PRTF") dated November 1, 2004, based on medical evidence starting in March 2004, non-examining clinical psychologist Dr. Jeanette Maldonado rated claimant mildly restricted in activities of daily living, maintaining social functioning, and maintaining concentration, persistence, or pace, with no episodes of decompensation. The PRTF stated that claimant had a mood disturbance and a depressive disorder (not otherwise specified) characterized by depressive mood and fair short-term memory, which was severe but not chronic and would not be expected to last twelve months given continued psychotherapy. (Tr. 197-211).

In another DDP psychiatric medical report dated March 6, 2005, based on monthly visits over the previous six months, Dr. López diagnosed mixed-type bipolar disorder and reported that claimant displayed severe bipolar symptoms. He opined that her severe, deteriorating physical condition was "irreversible and disabling" and did not improve with analgesics or physical therapy. Dr. López reported that claimant had an episode of untreated depression in 1999 due to marital problems, and

that claimant left her job because of problems with supervisors and other employees, low productivity, absenteeism, and lateness.  He reported that claimant could not do any daily living activities or care for herself, had no social relationships, and left the house only for doctor appointments.  She was impulsive, hostile, enervated, tired, anxious, and restless, had hallucinations, anhedonia, insomnia, and appetite problems, and felt useless.  Dr. López reported that claimant was very emotionally fragile, with low psychomotor activity, restricted affect, and a sad, anxious, tense mood.  She had logical, coherent, relevant thought, was oriented in person and place but not time, and had poor concentration, insight, retention, memory, and judgment.  She showed mild cognitive impairment and distracted attention, could not complete any of the memory and intellectual functioning tests, and cried during the tests.  She was taking the same medications as previously reported in August 2004, and Dr. López reported the same diagnosis, prognosis (poor), GAF score (40%), and inability to handle funds as he had given in that report.  (Tr. 229-35).

On May 6, 2005, after reviewing Dr. López's reports, non-examining clinical psychologist Dr. Orlando Reboredo stated other medical evidence of record in claimant's file did not support the treating doctor's claimed intensity, and that "severe" conditions were not expected at all based on the other evidence, and requested a second opinion.  (Tr. 286).  Thereafter, psychiatrist Dr. Antonio Llona Sanchez completed a psychiatric evaluation of claimant on June 20, 2005.  Dr. Llona reported that claimant told him she had been diagnosed with fibromyalgia and had been seeing Dr. López monthly for more than a year, with partially effective results.  She stated that she frequently cried, got angry and irritable, felt unloved, nagged her family, and broke things.  She was taking Ambien, Risperdal, Depakote, Effexor, and Ativan.  Dr. Llona also interviewed claimant's husband, who stated that her hand condition had not improved after treatment at the SIF.

Dr. Llona reported that claimant focused primarily on her physical problems during the evaluation.  She stated that relatives helped her with household chores, which she could not regularly do because of weakness in her hands.  She reported that she spent almost all day at home, cared for her own hygiene, did not watch TV or drive, and had no social or cultural activities.  She was alert,

depressive, looked on the verge of tears at times, had adequate affect and average psychomotor activity, and had adequate, realistic flow of thought.  She had self-deprecating, hopeless, and vaguely nihilistic ideas, with no formed hallucinations but some perceptual disorders when falling asleep or in the dark.  She was oriented in person and place and partially oriented in time.  She had adequate recent and remote memory, but short attention span and poor concentration.  She recalled two of five words on a memory test, performed poorly on mathematics tests, and refused to complete a test about letters of the alphabet.  Dr. Llona diagnosed major depression, deemed her able to handle a limited amount of assets, noted limitations in claimant's interpersonal and family relationships, and reported that she had a doubtful ability to persist in duties beyond simple and repetitive.  (Tr. 260-67).

In a mental RFC assessment dated August 3, 2005, based on medical evidence beginning in March 2004, Dr. Reboredo gave a diagnosis of "significant" bipolar disorder.  He concluded that claimant had unlimited ability to remember locations and work-like procedures, understand, remember, and carry out very short and simple instructions, work in coordination with or proximity to others, and make simple work-related decisions, but was moderately limited in the ability to understand, remember, and carry out detailed instructions, maintain attention and concentration for extended periods, perform activities on schedule, maintain attendance and punctuality, sustain an ordinary routine without special supervision, and complete a normal workday and -week without psychological interruptions and at a consistent pace of performance.  Other than moderate limitation in the ability to interact appropriately with the general public, she had no limitations in social interaction and no adaptive limitations.

In the RFC assessment, Dr. Reboredo wrote that based on Dr. Llona's evaluation and Dr. López's March 2005 report, claimant had no thought or perceptual disorders, was in fair contact with reality, had fair impulse and behavioral control, could communicate at will and follow verbal commands, and had mild to moderate deficits in cognitive functions.  Dr. Reboredo concluded that claimant could learn, understand, remember and execute at least simple instructions; sustain pace and attention and persist at work activities during a regular workday or workweek; adjust to changes

in schedules, routines, or work demands; and interact with the public, coworkers, and supervisors. (Tr. 268-71).  Dr. Reboredo also completed a PRTF along with the mental RFC assessment, based on medical evidence from March 2004 to date.  He concluded that claimant had an affective disorder, namely a mood disturbance and bipolar syndrome.  The PRTF rated claimant moderately restricted in activities of daily living, maintaining social functioning, and maintaining concentration, persistence, or pace, with no episodes of decompensation.  (Tr. 272-85).

In a "Medical Source Statement of Ability to Do Work-Related Activities (Mental)" dated June 11, 2007, Dr. López wrote that due to her severe physical and mental illness, claimant had moderate limitations on her ability to understand, remember, and carry out short and simple or detailed instructions, to make judgments on simple work-related decisions, to interact appropriately with the public, supervisors, and coworkers, and to respond appropriately to changes and work pressures in a usual work setting.  He reported that her cognitive capability was impaired by forgetfulness.  (Tr. 287-88).

In a June 18, 2007 psychiatric evaluation based on visits from March 2004 through June 2007, Dr. López opined that claimant was totally disabled and could not return to work due to her severe, deteriorating physical condition.  Dr. López reported that claimant had difficulty carrying out daily living activities, always used a cane, was aggressive and impulsive, and had low self-esteem, low energy, and problems with sleep, appetite, and weight.  She cried, experienced auditory and visual hallucinations, was fatigued and anxious, and had a sad, anxious, tense mood, restricted affect, poor visual contact, and decreased rhythm, tone, and volume of speech.  Dr. López reported that claimant was logical, coherent, and relevant, oriented in person and place but not in time, and had poor recent memory, tolerance, alertness, attention, concentration, insight, and judgment.  She was being treated with Effexor, Ambien, Depakote, Risperdal, and Lorazepam.  Dr. López gave claimant a very poor prognosis and a GAF score of 50% and deemed her able to handle funds.  (Tr. 318-25).  In a November 15, 2007 letter to the ALJ, Dr. López wrote that claimant's bipolar disorder was ongoing and that her worsening physical conditions were affecting her psychologically.  (Tr. 328).

**Santana v. Commissioner of Social Security**                                    Page 12
Civil No. 10-1714 (DRD/BJM)
**REPORT AND RECOMMENDATION**

## III.    Procedural History

Santana filed for disability benefits on July 14, 2004.  Her claim was denied initially and upon reconsideration.  (Tr. 17).  Claimant timely requested a hearing, which was held before ALJ Theodore W. Grippo on November 19, 2007.  (Tr. 332-352).  At the hearing, claimant, who was represented by counsel, testified that she became unable to continue working due to severe pain in her hands and neck which predated the alleged disability onset date.  She attributed the pain to the heavy work she performed, lifting and pushing boxes, as both a packer and a quality inspector. Claimant testified that the work entailed standing, lifting and carrying about 20 to 25 pounds, and frequently using her hands to push, lift, and scan boxes using a two-pound label-reading machine.[2] She testified that she had very severe pain in her hands, neck, shoulders, and lower back, and that when she had back pain, she felt it all the way down to her feet.  She testified that the pain persisted despite monthly treatments since 2000, since therapy, injections, and medications relieved the pain only temporarily, and physical therapy did not help and sometimes aggravated the pain.  She testified that while she had never been hospitalized, she had gone to the emergency room for back pain, though she could not remember the date of her last visit.  (Tr. 336-42).

Santana testified that she has a mood condition stemming from her physical condition, since she is not able to do anything, and that her physical condition is worse than her mental condition. She testified that Dr. López treated her on a monthly basis, but that the pills he gave her did not help. She testified that she feels like a different person, does not work, has appetite and sleep problems, fights and cries a lot, does not like or care about anything, forgets things, has to be reminded to take her medications, cannot do household chores, and no longer drives.  She has no interest in going shopping or traveling, does not go out, such as for family gatherings or her son's school events, and does not help him with homework.  Claimant testified that she spends most of the day at home or at her mother-in-law's house, and that her mother and mother-in-law do everything for her child

---

[2] In her disability benefits application, claimant wrote that her job required her to walk or stand for eight hours a day, lift up to 50 pounds, and frequently lift up to 25 pounds.  (Tr. 81).

because she is unable to take care of him. (Tr. 342-48).

The ALJ took the testimony of a vocational expert ("VE") at the hearing. The VE testified that Santana had no transferable skills from her past work. The ALJ asked the VE whether a person with the same age, education, and relevant past work experience as the claimant, who had the ability to perform medium work with no more than occasional climbing and who could follow simple but not complex directions, would be able to perform the claimant's past relevant work. The VE responded that she could perform the packer job, but not the quality inspection job, which requires more attention and concentration. Claimant's counsel asked the VE if a person who does frequent and light movements involving five pounds that cause pain in her upper extremities, and who has an emotional condition affecting her concentration, memory, and attention even when doing simple tasks, could perform claimant's previous work or any other job. The VE responded that she would not be able to do her job in a sustained manner and thus would be impaired from any other job in the market. (Tr. 348-51).

The ALJ issued his decision on January 25, 2008. (Tr. 11-29). Reviewing the evidence of record, the ALJ found that Santana was not disabled. The ALJ found that claimant's back disorders, mild tendinosis of the right shoulder, and affective disorder were severe impairments. The ALJ found that the record showed claimant's pain and migraine headaches were amenable to treatment and had been stabilized with conservative treatment with oral medications, and that claimant had shown significant improvement from ongoing psychiatric treatment for a depressive disorder. (Tr. 20). The ALJ concluded that claimant was moderately restricted in daily living activities, social functioning, and concentration, persistence, or pace, with no episodes of decompensation. (Tr. 20).

The ALJ determined that claimant had the physical RFC to perform all types of medium work except climbing. He concluded that claimant could lift/carry 50 pounds occasionally and 25 pounds frequently; sit, stand, or walk for 6 hours in an 8-hour workday; had no limitation in pushing, pulling, handling, fingering, feeling, grasping, or pinching; had diminished strength but full range of motion; and had no postural, visual, communicative, or environmental limitations. The ALJ

concluded that claimant had the mental RFC to learn, understand, remember, and carry out simple but not detailed or complex job instructions; to sustain attention, concentration, and pace during a regular workday or workweek; to complete a normal workday and/or workweek without undue interruptions; to respond appropriately to supervisors, coworkers, and usual work situations; and to deal with work changes in a routine work setting.  (Tr. 20-21, 28).

    In reaching his RFC assessments, the ALJ stated that after considering the evidence of record, he found that claimant's medically determinable impairments could have been reasonably expected to produce the alleged symptoms, but that her testimony about the symptoms' intensity, persistence, and limiting effects was not entirely credible.  (Tr. 22).  The ALJ stated that he closely observed claimant's demeanor and behavior during the hearing and noted that his observations were only one factor among many he relied on in reaching his conclusion about the credibility of her testimony and her RFC.  (Tr. 27).  The ALJ summarized the medical evidence from the June 1997 physical therapy, the SIF records, Dr. Rivera's reports, Dr. Arnau's records, Dr. Hernández's neurological evaluation, Dr. Brugueras's arthritis medical report, Dr. López's reports, and Dr. Llona's evaluation.  (Tr. 22-27).  The ALJ noted the VE's opinion that claimant could do her prior work, found the VE's testimony consistent with SSA regulations, and expressed his full agreement with the VE's findings and opinions.  (Tr. 27).

    The ALJ declined to give controlling weight or deference to Dr. López's opinion evidence because it was disproportionate in severity to the preponderance of the record evidence; his entries do not state the bases or factors that support his assessments; he did not fill out the forms as required, which detracted from their probative value and his conclusions therein; neither he nor any other doctor of record placed or recommended claimant for hospitalization due to her mental condition; claimant never had to seek emergency treatment for that condition; and his opinions and conclusions are on issues reserved to the Commissioner.  (Tr. 27).  The ALJ gave greater weight to the opinions of state agency personnel, along with the evaluations of Dr. Hernández and Dr. Llona, regarding the severity of claimant's physical and mental impairments and RFC.  (Tr. 27-28).

The ALJ determined that the objective medical evidence of record did not support claimant's allegations of severe, disabling pain in the cervical and lumbar regions with limitation of motion, hand pain, and associated numbness and lack of strength, as the preponderance of medical evidence did not show diagnostic studies or lab findings to support such allegations. The ALJ concluded that the clinical findings show only tenderness and muscle spasm upon neck and lumbar palpation with some limitation in range of motion of the cervical and lumbar spines. The ALJ noted that claimant had been treated conservatively with oral medications and physical therapy, which evidently relieved her symptoms, without requiring hospitalization, ER treatment, or surgery. (Tr. 28).

The ALJ determined that the psychiatric evidence showed that claimant was not mentally dysfunctional, as the preponderance of evidence describes her as alert, logical, coherent, relevant, and mostly oriented, with mostly preserved cognitive functioning save for some memory and concentration limitations. The ALJ noted that claimant's treatment had been conservative, without psychiatric hospitalization, and that she was able to care for her personal needs and perform definite activities of daily living. Based on this evidence, the ALJ concluded that claimant's depressive disorder was moderate and did not preclude her from performing basic work activities, and that from the non-exertional standpoint, claimant retained the ability to perform simple tasks. The ALJ determined that at most, the evidence showed that claimant's depression imposed only moderate restriction on activities of daily living, social functioning, and maintaining concentration, persistence, or pace. The ALJ found his RFC assessment to be in line with the state agency's consultants' medical opinions and assessments, which the ALJ found persuasive and adequately supported by the evidence of record. (Tr. 28-29).

Accordingly, the ALJ determined that Santana was not disabled within the meaning of the Act at any time from October 4, 2000, the alleged disability onset date, through December 31, 2005, the date last insured. (Tr. 29). Plaintiff's request for review was denied on May 20, 2010, making the ALJ's decision the final decision of the Commissioner. (Tr. 5-10).

## DISCUSSION

The analysis in this case revolves around the ALJ's determination at step four in the sequential evaluation process contained in 20 CFR § 404.1520.  At that step, the ALJ will consider the assessment of the plaintiff's RFC and her past relevant work.  If the plaintiff can still perform her past relevant work, then the ALJ will find the plaintiff not to be disabled.  20 CFR §404.1520(e).  This court must determine whether substantial evidence supports the ALJ's decision that plaintiff Santana was not disabled prior to the date last insured.

First, plaintiff argues that the ALJ improperly discredited plaintiff's testimony since the ALJ did not state precisely what the claimant said or did that undermined her credibility.  (Docket No. 9, p. 12-13).  Such a level of detail is not required.  See Dyer v. Barnhart, 395 F.3d 1206, 1210 (11th Cir. 2005) ("there is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision").  In reaching his disability determination, the ALJ was not bound by claimant's testimony which was contrary to the objective medical evidence.  See Akbar-Afzali v. Callahan, 968 F. Supp. 578, 584 (D. Kan. 1997).  Contrary to what plaintiff suggests, her own testimony does not constitute medical evidence, and the record does contain objective medical evidence, such as x-rays and electrodiagnostic tests, in addition to claimant's own allegations to her treating doctors.  The ALJ properly took claimant's testimony into consideration and did not err by affording it less weight to the degree it conflicted with objective medical evidence in the record.

Next, plaintiff argues that the ALJ applied an erroneous legal standard as to evidentiary weight by affording greater weight to the opinions of the agency's own experts than to the reports by treating doctors regarding claimant's mental impairment.  (Docket No. 9, p. 13-17, 21-23).  Claimant argues that so long as they are sustained by clinical evidence, treating physicians' findings must be given more weight than a consultative evaluation where the evaluating doctor has seen the claimant only once or not at all.  (Docket No. 9, p. 21-22).  Generally, ALJs give "*more* weight to opinions from [a claimant's] treating sources, since these sources are likely to be the medical

professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s)." 20 C.F.R. § 404.1527(d)(2).  But claimant cites no authority for her imperative proposition; to the contrary, an ALJ may grant greater weight to non-treating sources in appropriate circumstances. Rodríguez Pagán, 819 F.2d at 3; Lizotte, 654 F.2d at 130.  And "[t]he responsibility for weighing conflicting evidence, where reasonable minds could differ as to the outcome, falls on the Commissioner and his designee, the ALJ." Seavey v. Barnhart, 276 F.3d 1, 10 (1st Cir. 2001).

Here, the ALJ considered the opinions of both Dr. López and Dr. Llona, whose evaluation was taken specifically because the agency's expert requested a second opinion before submitting a mental RFC assessment, as he found Dr. López's opinion at odds with other record medical evidence he reviewed. (Tr. 286).  Dr. Llona's examination of claimant led him to conclude that claimant's mental condition imposed milder limitations on her than Dr. López had reported.  As the Commissioner's designee, the ALJ was entitled to weigh the conflicting reports (as well as the mental RFC assessment in the record) and afford more weight to Dr. Llona's than Dr. López's. Claimant also argues that Dr. Llona's report accords with Dr. López's in certain respects, namely claimant's needing help with household chores and her performance on the doctors' memory tests. (Docket No. 9, p. 14-15).  Yet the ALJ was perfectly within his discretion to evaluate such internally consistent evidence of claimant's non-exertional limitations, along with other evidence (*e.g.*, the lack of objective medical evidence of neurological deficits), in order to conclude that claimant had the ability to do her past relevant work. (Tr. 28).  Accordingly, I find that the ALJ did not apply the wrong legal standard in deciding what weight to give the opinion evidence in the record.

Next, plaintiff argues that the ALJ did not consider the record as a whole because the mental and physical RFC assessments were themselves not based on all the evidence of record. (Docket No. 9, p. 19-21).  Contrary to claimant's allegation, Dr. Rodriguez's physical RFC assessment expressly notes that it was based on a range of evidence, not merely Dr. Hernández's report, which claimant singles out to attack as insufficient. (Tr. 253).  Moreover, the ALJ devoted several pages of his

decision to reviewing and summarizing medical evidence of both the mental and physical impairments alleged by claimant.  The evidence cited includes records from the SIF and claimant's 1997 physical therapy, as well as the reports from Doctors Rivera, Burgueras, and Arnau, in addition to Dr. Hernández's neurological evaluation.  In reaching his mental RFC assessment, the ALJ reviewed the evidence from Drs. López and Llona, in addition to non-treating Drs. Maldonado and Reboredo's mental RFC assessment and PRTFs, which explicitly state that they were based on Dr. López's records since March 2004, when he began treating claimant.  In short, there is no evidence to support claimant's argument that the ALJ did not consider the record as a whole.

Next, plaintiff argues that the ALJ substituted his own opinion for the medical opinions in the record.  (Docket No. 9, p. 23).  An ALJ may not substitute his own judgment for uncontroverted medical opinion.  Rosado v. Sec'y of Health & Human Servs., 807 F.2d 293-94 (1st Cir. 1986) (citations omitted).  Claimant does not specify where in his decision the ALJ supposedly does so.  The ALJ took into consideration the physical and mental RFC assessments in the record, as well as the evaluations by Drs. Rivera, Llona, and López of the physical and mental limitations on claimant's ability to perform various work-related activities.  (Tr. 23, 26-28).  Accordingly, there is no evidence that the ALJ impermissibly disregarded the RFC evaluations in the record and substituted his own judgment for medical opinion.  See Rosado, 807 F.2d at 293-94.

Finally, plaintiff contends that the ALJ erroneously excluded some of the VE's testimony in reaching his conclusion that she was able to perform past relevant work.  (Docket No. 9, p. 23-25).  Claimant alleges that the ALJ improperly disregarded the VE's response to her counsel's hypothetical, wherein frequent movement of five pounds would cause claimant pain in the upper extremities and an emotional condition would impair claimant's ability to do even simple tasks.  (Id., p. 24).  However, the ALJ concluded that claimant had the RFC to lift 25 pounds frequently and to learn, understand, remember, and carry out simple job instructions.  He based these determinations on the RFC assessments of Drs. Rodriguez and Reboredo, which themselves were based on reviews

of the record evidence of claimant's physical and mental impairments, respectively.  The ALJ may rely on the VE's testimony to find that the claimant is able to perform past work only so long as the VE's testimony is in response to an accurate hypothetical.  See Felisky v. Bowen, 35 F.3d 1027, 1036 (6th Cir. 1994).  Since the ALJ's hypothetical to the VE was accurate whereas counsel's hypothetical to the VE was not consistent with record evidence, the ALJ did not err in agreeing with the VE's testimony that claimant could do her past relevant work, based on the ALJ's hypothetical.

In sum, the record here contains substantial evidence in support of the Commissioner's decision. Although the evidence arguably may have justified a different conclusion, it is not this court's duty to second-guess the Commissioner's determination. Because substantial evidence supports the ALJ's determination, the Commissioner's decision must be affirmed.

## CONCLUSION

For the reasons stated above, I recommend that the Commissioner's decision be **AFFIRMED**.

This report and recommendation is filed pursuant to 28 U.S.C. 636(b)(1)(B) and Rule 72(d) of the Local Rules of this Court. Any objections to the same must be specific and must be filed with the Clerk of Court within fourteen (14) days of its receipt.  Failure to file timely and specific objections to the report and recommendation is a waiver of the right to appellate review.  See Thomas v. Arn, 474 U.S. 140, 155 (1985); Davet v. Maccorone, 973 F.2d 22, 30-31 (1st Cir. 1992); Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co., 840 F.2d 985 (1st Cir. 1988); Borden v. Sec'y of Health & Human Servs., 836 F.2d 4, 6 (1st Cir. 1987).

**IT IS SO RECOMMENDED.**

In San Juan, Puerto Rico, on this 19th day of May, 2011.

S/Bruce J. McGiverin
BRUCE J. McGIVERIN
United States Magistrate Judge